UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**In Admiralty**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | No. |
| | ) | |
| SLH2021 S.A. (Owner, M/V PS Dream), | ) | |
| PRIVE SHIPPING DENIZCILIK TICARET | ) | |
| A.S. (Operator, M/T PS Dream), PETRO | ) | |
| PLUS GENERAL TRADING LLC (Disponent | ) | |
| Owner, M/T PS Dream), and Surety Bond | ) | |
| | ) | |
| *Defendants.* | ) | |

**UNITED STATES' VERIFIED COMPLAINT**

**Nature of Action**

1.  The Motor Tanker PS Dream was briefly held in the United States pending investigation for suspected environmental crimes. To secure its release, the vessel interests, "Defendants" herein, entered into an Agreement on Security with the U.S. Coast Guard, which is attached as Exhibit A. The vessel was allowed to depart, and now Defendants fail to abide by the terms of the Agreement. For the welfare and benefit of those members of its crew who remain in the United States, the government respectfully asks the Court to direct compliance and to provide other relief, as it finds appropriate.

**Jurisdiction and Venue**

2.  The Agreement on Security is a maritime contract. *Nederland Shipping Corp. v. United States*, 18 F.4th 115, 127 (3d Cir. 2021). It is considered a maritime

contract because "the primary objective of the Agreement was to secure the Vessel's departure clearance, so that it could continue its maritime trade." *Id*.

3. The United States District Court for the Eastern District of Louisiana has subject-matter jurisdiction pursuant to 28 U.S.C. § 1333 (Admiralty, maritime and prize cases) and Rule 9(h) (Admiralty or Maritime Claim) of the Federal Rules of Civil Procedure. The Supplemental Admiralty Rules, which follow the Rules, codify traditional maritime practice.

4. A general venue statute provides that a civil action may be brought, *inter alia*, in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated[.]" 28 U.S.C. § 1391(b)(2). Here, withdrawal of the PS Dream's departure clearance, its return, and the execution of the Agreement at issue occurred within this Court's territorial jurisdiction.

5. The Agreement on Security contains a forum-selection provision, which states that "[a]ny dispute between the United States and Owner or Operator regarding payment under this paragraph shall be submitted to the United States District Court for the Eastern District of Louisiana. In any such dispute wherein one party claims a breach of the terms and conditions therein, the party asserting that there has been a breach of the Agreement shall bear the burden of proof." Exhibit A (Agreement) at lines 121-125.

## Parties

6. The United States is authorized to bring suit. *See* 28 U.S.C. § 1345 (United States as Plaintiff).

7. Defendant SLH2021 S.A., owner of the PS Dream (IMO# 9358307), is a Panama-domiciled company with an address at Suite 502, 5th Floor; World Trade Center, Calle 53 Este, Urbanizacion Marbella; Panama City, Panama. Exhibit A, lines 3-6. It is not found within the territorial jurisdiction of any federal district court in the United States or its territories. *See id.*, line 9 (stating that "[t]he Owner does not have any offices or employees").

8. Defendant Petro Plus General Trading (Petro Plus) has offices at Unit No. 605, Burj Al Salam, Skeih Zaed Road, Dubai, United Arab Emirates.[1] *Id.*, lines 18-21. It likewise is not found within the territorial jurisdiction of any federal district court in the United States or its territories. *Id.*, line 26 (stating that "[t]he disponent owner does not have any other offices").

9. Finally, Defendant Prive Shipping Denizcilik Ticaret A.S. (Prive Shipping), operator of PS Dream, is a Turkey-domiciled company with offices at Fulya Mahallesi, Büyükdere Cd. Torun Center D Blok No: 34, Kat: 8, 34394 Sisli, Istanbul, Turkey. *Id.*, lines 37-40. Similarly, it is not found within the territorial jurisdiction of any federal district court in the United States or its territories. *Id.*, line 44 ("The Operator does not have any other offices.").

---

[1] Petro Plus is the disponent owner of PS Dream through the execution of a bareboat charter agreement. A disponent owner does not hold legal title to a vessel, but for purposes of a charterparty acts as if it does. *In re Arbitration between Andros Compania Maritima, S.A. and Marc Rich & Co., A.G.*, 579 F.2d 691, 693 n.1 (2d Cir. 1978). From a legal perspective, the United States understands it to be an owner pro hac vice.

## General Allegations

**I.     The International Convention for the Prevention of Pollution from Ships**

10.     The United States is a signatory to the International Convention for the Prevention of Pollution from Ships, Nov. 2, 1973, as modified by the Protocol of 1978, opened for signature Feb. 17, 1978, 1340 U.N.T.S. 62, 184 (1983) (MARPOL), a multilateral international treaty that imposes strict pollution controls on vessels engaged in international trade.

11.     MARPOL seeks to limit oil pollution from "operational discharges," *i.e.*, deliberate discharges, by prohibiting vessels from discharging oil and oily water mixtures into the ocean.  *See* MARPOL, Annex 1.  MARPOL Annex 1 and the United States law and regulation implementing the Treaty require filtration and monitoring of certain overboard discharges.

12.     MARPOL also mandates that vessels document their discharges or transfers of oil and oily mixtures.  Each ship must keep an Oil Record Book in which it records discharges of oil and oily mixtures into the sea.  *See* MARPOL, Annex 1, Reg. 17, Add. 22-23; *see also id.*, 24-29 (required MARPOL form for Oil Record Book).

13.     Tank vessels such as the PS Dream must maintain two Oil Record Books, one pertaining to engine room operations and the other to cargo tanks.  Each entry in the Oil Record Book "shall be signed by the officer or officers in charge of the operations concerned and each completed page shall be signed by the master of ship." *Id.*, Reg. 17(4), Add. 23.  *See also* 33 C.F.R. § 151.25 (implementing regulations for maintaining the Oil Record Book).

14.     The State parties to MARPOL "undertake to give effect" to the protocol and its Annexes, "in order to prevent the pollution of the marine environment by the discharge of harmful substances or effluents containing such substances in contravention of the Convention." MARPOL, Art. 1, 1340 U.N.T.S. at 184.

15.     "Any violation of the requirements" of MARPOL "within the jurisdiction of any Party * * * shall be prohibited and sanctions shall be established therefor under the law of that Party." *Id.*, Art. 4(2), 1340 U.N.T.S. at 186. The penalties imposed by a State party's domestic law must be "adequate in severity to discourage violations" of MARPOL. *Id.*, Art. 4(4), 1340 U.N.T.S. at 186.

16.     Party nations bind themselves to enforce MARPOL "using all appropriate and practicable measures of detection and environmental monitoring," and "adequate procedures for * * * accumulation of evidence." MARPOL, Art. 6(1), 1340 U.N.T.S. at 187.

## II.     The Act to Prevent Pollution from Ships

17.     In the United States, the Act to Prevent Pollution from Ships (APPS) implements MARPOL. 33 U.S.C. §§ 1901-15. Under APPS, the Secretary of Homeland Security "shall administer and enforce" the treaty, as well as statutes and regulations designed to preserve the marine environment. 33 U.S.C. § 1903(a). *See also* 33 C.F.R. Subchapter O, pt. 151, subpart A (Coast Guard implementing regulations).

18.     Under APPS, "[a] person who knowingly violates the MARPOL Protocol," APPS, or the implementing regulations commits a felony and is subject to potential criminal prosecution. 33 U.S.C. § 1908(a).

19.     A foreign-flagged vessel must obtain a departure clearance from the Secretary of Homeland Security before proceeding from a port or place in the United States.  46 U.S.C. § 60105(b).  APPS authorizes the Secretary to withhold that clearance "if reasonable cause exists to believe that the ship, its owner, operator, or person in charge" has violated laws prohibiting marine pollution.  33 U.S.C. § 1908(e).

**III.    The PS Dream Arrives at the Port of New Orleans**

20.     On January 12, 2023, Coast Guard Sector New Orleans received allegations from a crewmember on board PS Dream who alleged that the vessel had unlawfully discharged waste oil directly overboard while in international waters.  Exhibit B (Santiago Decl.) ¶ 5.  At the time, the vessel was scheduled to call at the Port of New Orleans, Louisiana.  *Id*.

21.     The discharges took place between January 11 and 13, 2023, and involved the unlawful transfer of an oily-water mixture from the residual oil tank into the ocean without proper filtration, without the monitoring of oil content, and without having been recorded in the ship's Oil Record Books.  *Id*.

22.     Shortly after its arrival in New Orleans, the U.S. Coast Guard conducted a Port State Control Examination of PS Dream, which began on January 26, 2023.[2]  *Id*.  During this examination, a second crewmember corroborated the initial report.  *Id*.

---

[2] A port state control inspection is "the inspection of foreign ships in national ports to verify that the condition of the ship and its equipment comply with the requirements of international regulations and that the ship is manned and operated in compliance with these rules."  *Monarch Shipping Co. v. United States*, No. 13-80661-CIV, 2013 WL 5741836, at *1 n.1 (S.D. Fla. Aug. 15, 2013) (omitting citation).

23. The United States "asserts that the Vessel is subject to the MARPOL Protocol 73/78, the Act to Prevent Pollution from Ships ('APPS'); that the Vessel violated MARPOL Protocol 73/78, APPS, 33 U.S.C. § 1908(a), and the regulations thereunder . . . , and that a U.S. District Court may assess criminal penalties against the Vessel *in rem* or its Owner and/or Operator *in personam*."[3] Exhibit A (Agreement on Security) at lines 54-59. *See also* Exhibit B ¶ 3 (listing possible violations of law).

24. Given probable cause to suspect that environmental crimes had been committed by the ship's crew, the U.S. Coast Guard requested that the U.S. Customs and Border Protection agency withhold the vessel's departure clearance. *See* Exhibit B ¶ 7 ("On February 7, 2023, U.S. Customs and Border Protection withheld the PS DREAM's clearance to leave port at the Coast Guard's request pursuant to 46 U.S.C. § 60105.").

**IV.   The Agreement on Security**

25. Just as Section 1908(e) authorizes the Secretary of Homeland Security to withhold a vessel's departure clearance, it allows the Secretary to return it under certain conditions. In particular, vessel interests must furnish security that satisfies the Secretary that the criminal investigation and potential prosecution can continue without holding the vessel in the United States. *See* 33 U.S.C. § 1908(e) ("Clearance may be granted upon the filing of a bond or other surety satisfactory to the Secretary.").

26. Before restoring the PS Dream's departure clearance, the Coast Guard requested that Defendants post a $2,000,000 bond and take other steps to preserve the

---

[3] Although the Security Agreement refers only to the vessel owner and operator, all three entities—Owner, Disponent Owner, and Operator—agreed to be bound by its terms.

7

government's interests. These terms were memorialized in the Agreement, Exhibit A, executed on March 26, 2023, by the Coast Guard on behalf of the United States and by the Owner, Disponent Owner, and the Operator of the PS Dream.

27. The bond was posted. *See* Exhibit C (Surety Bond for Release of Vessel).

28. Of the PS Dream's total crew of twenty-three, seventeen were asked to remain in the United States to assist in the investigation. *See* Exhibit A (Agreement) at lines 148-170 (identifying crew members who agreed to "remain within the jurisdiction of the United States District Court for the Eastern District of Louisiana."). Subsequently, the crewmember serving as the ship's Electrician was not needed, and he has since been repatriated.

29. Three other crewmembers with urgent family matters, but who are still needed in the District, were allowed to return home temporarily. Specifically, the United States allowed an Oiler to temporarily leave due to the death of his father. Likewise, the Bosun and the Second Engineer were each allowed to leave temporarily with an agreement to return in approximately one month. Defendants agreed to arrange and pay for airfare only for the Oiler, whose relative works for Prive. Defendants did not object to any of these temporary departures, but refuse to pay for their salaries, per diem, hotel and health care on their return.[4]

30. The Owner, the Disponent Owner, and the Operator also agreed not to

---

[4] The Agreement does not address the cost of a temporary departure and return during the investigation for humanitarian reasons, however, neither the undersigned nor the criminal prosecutors handling the criminal investigation are aware of any prior instance where the owner or operator have refused to do so, as is the case here.

retaliate against any officer or crewmember or other employee as a result of the officer's or crewmember's or other employee's cooperation with the United States:

> Owner and Operator will act in good faith in carrying out these obligations. No disciplinary measures or legal proceedings or any other retaliatory actions will be instituted by the Owner and/or Operator or any agent of the Owner and/or Operator of the Vessel against any officer or crewmember or other employee as a result of the officer's or crewmember's or other employee's cooperation with the United States. No efforts will be undertaken to retaliate against the officers or crewmembers or other employees for their cooperation, either now or at any time in the future, and the Owner and Operator will make reasonable efforts to prevent third parties from the doing the same.

*Id.*, lines 137-145.

31. The Owner, the Disponent Owner, and the Operator further agreed to provide crewmembers identified as potential witnesses with room and board in the greater New Orleans area:

> The Owner and operator agrees to provide reasonable lodging, a meal allowance of $59.00 USD per day (or $40.00 USD per day if the lodging provides meals or kitchen facilities. A microwave alone is not deemed a kitchen facility), and health care coverage to the aforementioned ship's officers and crewmembers of the Vessel while in the United States, regardless of the current employment status of the aforementioned ship's officers and crewmembers, until the United States, through its attorney responsible for the pending criminal investigation, advises that their presence is no longer necessary.

*Id.*, lines 171-178.

32. The Owner, the Disponent Owner, and the Operator agreed to pay their full salaries on an ongoing basis until the case is resolved:

> Owner and Operator agree to continue to employ and to pay total wages in a timely manner and in a manner consistent with any applicable collective bargaining agreements or employee contracts until the United States, through its attorney responsible for the pending criminal investigation, advises that

their presence is no longer necessary, except that the Owner and Operator will not be required to employ or pay wages for any ship's officer or crewmember listed in subpart (a) who is convicted of a crime arising from and related to the facts of the Alleged Violations. "Total wages" as used in this paragraph includes the total wage the crewmember contracted for and anticipated, including guaranteed overtime.

*Id.*, lines 197-206.

33. While the witnesses are not party to the Agreement, one of its purposes is to ensure that while in the United States, they are housed at no charge, paid their full salary, enjoy medical coverage, and receive a per diem allowance on which they can reasonably subsist.[5] This provision is necessary in agreements of this type to ensure that unscrupulous vessel owners or operators do not abandon seafarers in foreign ports. It is also intended to maintain the status quo and ensure that key witnesses to a crime remain available for the investigation and potential prosecution.

34. The Owner, the Disponent Owner, and the Operator authorized a law firm to accept service of process to respond to allegations, which the government now raises, that they breached the Agreement on Security:

> Owner and Operator authorize K&L Gates, LLP, as agent of Owner and Operator for this Agreement, to accept service of any correspondence or legal papers relating to the Alleged Violations on behalf of the Vessel Owner and Operator at its offices at 599 Lexington Avenue, New York, NY 10022. . . .

*Id.*, lines 312-315.

---

[5] Such provisions prevent vessel owners and operators suspected of criminal activity from canceling crew members' employment contracts, and refusing to pay for their repatriation, which strands them in the United States. *See, e.g., Guiseppe Bottiglieri Shipping Co. SPA v. United States*, No. 12-59 (S.D. Ala. Feb. 7, 2012), ECF No. 24-3 at 10-11 (vessel operator notified eight crewmembers that their contracts were being rescinded and that all expenses, including lodging and food, would soon become their personal responsibility).

36. The owner and operator terminated K&L Gates shortly after entering into the Security Agreement, however, current counsel agreed to be bound by the same terms.

V. **Defendants' Breach of the Agreement Creates Exigent Circumstances**

   A. **Salaries Are Too Little, and They Arrive Too Late**

35. The PS Dream's crew members are to be paid during the first week of the month for their work during the preceding month. *See* Exhibit B (Santiago Decl.) ¶ 12; Exhibit D (Smith Decl.) ¶ 3. While in the United States, however, they often do not receive their full salaries and when they are paid, the payment comes late, making it difficult for them to, in turn, pay bills at home. *Id*.

   B. **Per Diem Payments Are Inadequate**

36. The crew members' per diem allowance began at a reduced rate of $40 per day under the theory that cooking facilities are available, however, their quarters are inadequate for cooking or storing supplies. Exhibit B (Santiago Decl.) ¶ 13. No cooking or cleaning equipment such as pots, pans, silverware are provided by the hotels or Defendants. Even if cooking facilities were sufficient, the nearest grocery store is difficult to get to on foot and lies at some distance. *Id*. ¶ 14.

37. Two crew members have been housed in even worse conditions at the Extended Stay America in Metairie, 3300 S I-10 Service Road West, Metairie, Louisiana 70001. *Id.* ¶ 13. These two crew members, not coincidentally, were the ones who informed the Coast Guard of violations on board the *PS Dream* and which, accordingly, the Security Agreement required separate housing. They have been moved repeatedly, with each hotel being worse than the one before it. The Extended Stay America is not near an accessible

pedestrian pathway that would allow them to walk to a grocery store to purchase food to cook. *Id*. ¶ 14.



*Figure 1 (The pin shows Extended Stay America; the Arrow depicts Rouses Market)*

38. The nearest grocery is Rouses Market, which is 2.9 miles away, nearly an hour by foot. *Id*. They are forced to use Uber, typically spending $80/week on transit costs. *Id*.

39. One crew member, who made allegations about illegal conduct on board the ship, reported that his per diem payments are being periodically reduced without explanation, and recently he received only $340:

| Amount | Days Covered |
|---|---|
| $750 | 2/15/23 to 3/1/23 |
| $600 | 3/16/23 to 3/31/23 |
| $600 | 4/1/23 to 4/15/23 |
| $340 | 5/23/23 to 5/30/23 |

Exhibit B (Santiago Decl.) ¶ 13.

### C. The Hotel Accommodations Procured by Defendants Are Not Fit for Human Habitation

40. While housed onboard the *PS Dream*, each crew member had his own stateroom. *See* Exhibit D (Smith Decl.) ¶ 5. Here, however, each must live in unreasonably close quarters with another crew member, which in some instances has caused conflict due to room conditions, differing religious and dietary preferences. *Id.*

41. Crew members report squalid conditions. Exhibit B (Santiago Decl.) ¶ 15. Towels and linens are not changed regularly, which has led some crew to resort to washing them themselves. *Id.* Another crew member was obliged to seek outpatient treatment at a nearby hospital after contracting a bacterial infection, presumably communicated from unsanitary bedding. Moreover, crew members have encountered insect infestation in their rooms. *Id.* ¶ 15.

42. Finally, the hotel arrangements leave crew members with concerns for their personal safety. *Id.* They report apparent drug-dealing activity and violent altercations on the premises, from which the hotel provides little or no security. *Id.*

### D. Failure to Provide Medical Treatment

43. Crew members attempted through Defendants' shipping agent to arrange for medical care for an electrician who contracted an infection on his back due to unsanitary conditions at the hotel, for a fitter who complained that his eyes are burning, and for dental services for an able-bodied seaman. *See* Exhibit D (Smith Decl.) ¶ 6. In each instance, they were told that Prive has not sent sufficient funds to the shipping agent to pay for these

13

services. Here are a crew member's words:

> My managers are telling me no doctor/dentist appointments are being setup until Owners make payments. My manager said if Prive sends email with Dentist approval and wire transfer we will set it up. But unfortunately nothing will be set up unless it's a medical emergency and in that case to dial 911[.]

Exhibit D (Smith Decl.), Exhibit 2 (text message).

### E. Defendants Threaten Further Retaliatory Action

44. One witness, the ship's Bosun, was allowed to return home temporarily to attend to the birth of his child, however, his presence in the District remains necessary for the investigation and prosecution. He is one of the two individuals who reported the violations to the Coast Guard. Defendants did not object to his departure, yet they refuse to agree to pay his salary, hotel costs, per diem and medical expenses. *See* Exhibit E (Toomey E-Mail, May 19, 2023 ("[A]s to [the Bosun] . . . , Prive did not agree to anything upon [his] return. Should he return to the US, we would seek Court intervention to decide whether the security agreement resumes in such an event and take the position that it does not."). *See also* Exhibit F (USDOJ ltr, May 26, 2023) at 2 ("You have advised us that your clients have refused to agree to resume their obligations under the security agreement as to [the Bosun].").

45. The government explained in no uncertain terms that [the Bosun's] "presence in the district is still needed" in furtherance of the investigation. *Id*. at 1. He was allowed to depart temporarily for humanitarian reasons, to attend the birth of his child. Defendants are aware and were "advised . . . prior to [the Bosun's] departure that owner/operator is required to continue to provide all payments specified in the security agreement upon his

14

return to the United States for this investigation, to include housing, per diem, full salary, health care expenses, and cost of repatriation at the conclusion of this matter." *Id*.

46. Defendants' "refusal violates the security agreement in multiple respects, including the anti-retaliation provision, compared with the proposed treatment of other crewmembers." *Id*. at 2. It also creates the unfortunate impression that they are trying to make a key witness unavailable for the investigation and prosecution of this matter.

47. Defendants have also refused to abide by the terms of the Agreement with regard to paying housing, per diem, full salary, and health care expenses for the Oiler and Second Engineer upon their return to the district. Defendants, through counsel, have suggested that they prefer to litigate this particular requirement.

**E.     The Republic of Georgia Has Raised Concerns About Its Seafarers' Treatment**

48. An official of the Maritime Transportation Agency, within the Ministry of Economy and Sustainable Development for the Republic of Georgia, has raised concerns regarding the treatment of four of its seafarers involved in the investigation. *See generally* Exhibit G (Baramidze E-mail String). On May 17, 2023, Ms. Baramidze wrote to say, *inter alia*, that the "Georgian Seafarers do not have proper living conditions," are "unable to get their wages" on a timely basis, and that the $40 "per diem . . . is quite low and inappropriate." *Id*. (Baramidze E-mail, May 17, 2023). On June 13, 2023, she reiterated that these crew members seek "reimbursement of their wages and per diem." *Id*. (Baramidze E-mail, June 13, 2023).

49. The Turkish Consulate has raised similar concerns.

**First Cause of Action:**

15

**Declare that Defendants Are in Breach of the Agreement on Security**

50. Plaintiff United States incorporates by reference, and re-alleges as though fully set forth herein, each and every allegation as set forth in the preceding paragraphs of this Complaint.

51. In accordance with 28 U.S.C. § 2201, *et seq.*, and Federal Rule of Civil Procedure 57, an actual case or controversy exists in that Defendants are violating the Agreement on Security.

52. Defendants are in violation of the Agreement on Security in that they:

   a) Are routinely late in paying their crew's wages;

   b) Have not maintained the crew's health care benefits or provided necessary medical care;

   c) Are not providing reasonable accommodations to the crew during their stay in the greater New Orleans area;

   d) Are not making timely or sufficient per diem payments necessary to sustain the crew;

   e) Are retaliating against certain "cooperating" crewmember witnesses by providing them to unsafe and unsanitary lodging not located near places to eat or purchase groceries;

   f) Are retaliating against a "cooperating" crewmember witness who was temporarily allowed to leave the District at his own expense for humanitarian reasons by refusing to pay his salary, hotel, per diem and health care upon his return to the United States; and

   g) Are retaliating against certain seafarers who complained about their treatment by terminating payment to their counsel.

**First Prayer for Relief**

**WHEREFORE**, Plaintiff United States of America prays that the Court declare that Defendants to be in material breach of the Agreement for the aforementioned reasons and

that to rectify that breach, to issue an Order that will:

- a) Require Defendants to pay each of the PS Dream crewmembers on a specific date during the first week of each month as payment for the preceding month;

- b) Require Defendants to pay each of their seafarers $59.00 in per diem per day, rather than a reduced rate of $40.00 per day, and to do so every other Monday (i.e., every two weeks) in sufficient amount for the following two weeks;

- c) Require Defendants to relocate and pay for each one of their seafarers to hotels in the Eastern District of Louisiana subject to approval by the Coast Guard, giving each person his own room, provided that the cost falls within the federal per diem rate established by the General Services Administration;

- d) Require Defendants to arrange for and pay for health care and provide transportation to and from health care for each of their seafarers, by and through a local ship agent in New Orleans;

- e) Require Defendants to arrange, provide and pay the costs set forth in the Agreement on Security with regard to the four individuals who were permitted to temporarily leave the District for humanitarian reasons (Bosun, Oiler, Third Officer and Second Engineer) upon their return to the Eastern District of Louisiana and for the pendency of this matter, to include full wages, per diem, hotel, and health care; and

- f) Grant Plaintiff United States such other and further relief as the Court may deem just and proper.

The United States' primary aim is to enforce compliance with the letter and intent of the Agreement. The Court has inherent powers not only to ensure justice and enforce contracts, but also has a special obligation to protect the interests of foreign seafarers who are vulnerable.[6] In the unlikely event that Defendants continue to be non-responsive in the

---

[6] It is well within the purview of the federal courts protect the rights of witnesses, and of foreign seafarers in particular. *See*, *e.g.*, *United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("Foreign seafarers are a 'historically protected class.'"); *In re Eternity Shipping, Ltd.*, 444 F. Supp. 2d 347 (D. Md. Aug. 3, 2006) ("Historically, seamen have been considered 'wards of the admiralty.'").

face of a judicial order, the United States will have a basis to move to show cause as to why the vessel interests should not be held in civil or criminal contempt.[7]

## Second Prayer for Relief

**WHEREFORE**, should the Court declare that Defendants to be in material breach of the Agreement, and should Defendants fail to comply with its terms, then as contemplated in the Agreement on Security, Plaintiff United States of America prays that:

a) Defendants' Surety Bond for Release of Vessel, which is within this District, be attached as set forth in this Complaint, with interest and costs;

b) Pursuant to Supplemental Admiralty Rule B of the Federal Rules of Civil Procedure, process of maritime attachment and garnishment issue against said Surety Bond for Release of Vessel;

c) That judgment for the full amount of the bond be entered, such that the entire bond is liquidated and deposited in the registry of the Court;

d) That the Court appoint a custodian empowered to submit periodic claims with an accounting against this sum, to cover the cost of the crew's wages, the hotel expenses, and per diem charges; and

---

[7] The United States' primary aim is to require that Defendants care for their employees consistent with their obligations under the Agreement on Security. While specific performance is the goal of this litigation, the United States reserves its right to seek a more onerous outcome of forfeiture of the entire bond for bad faith and material breach of the Agreement or a judgment liquidating the full amount of the bond and placing it in the custody of a Court-appointed custodian to pay for the costs of maintaining the crew, plus all costs and interest, and any other relief the Court may find appropriate. Indeed, the Agreement on Security provides:

> If a United States court renders a finding that either the Owner or Operator materially breached other obligations contained in this Agreement, then the amount of the Surety Bond and any interest earned thereon shall be payable to the United States in reimbursement for actual expenses required for performance of the aforementioned obligations by the United States as directed by the court.

Exhibit A, lines 111-116.

This 30th day of June, 2023.

MICHAEL DILAURO
*Digitally signed by MICHAEL DILAURO Date: 2023.06.30 17:14:27 -04'00'*

Michael A. DiLauro
Attorney for Plaintiff United States

## Declaration

I, Michael A. DiLauro, upon solemn oath, hereby state:

1) That I am an attorney for the United States in the above-captioned case.

2) That I prepared the foregoing Complaint and believe the allegations contained therein are true; and

3) That such belief is based on my interview of a crew member, my discussions with counsel for the pool crew and with other government counsel, and on my review of the attached exhibits and other documents.

Dated:  June 30, 2023

                                        Respectfully submitted,

                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        DUANE A. EVANS
                                        United States Attorney

                                        */s/ Michael A. DiLauro*
                                        MICHAEL A. DiLAURO
                                        Senior Admiralty Counsel
                                        MALINDA R. LAWRENCE
                                        Trial Attorney
                                        JEANNE L. AMY
                                        Aviation, Space & Admiralty Litigation
                                        Torts Branch, Civil Division
                                        U.S. Department of Justice
                                        (overnight courier)

        175 N St., N.E., Ste. 8.1815
        Washington, D.C. 20002
        (mailing)
        P.O. Box 14271
        Washington D.C. 20044-4271
        Telephone: (202) 616-4047/4060
        Facsimile: (202) 616-4159
        michael.dilauro@usdoj.gov
        malinda.r.lawrence@usdoj.gov
        jeanne.l.amy@usdoj.gov
        *Counsel for Defendant United States*